Filed 7/28/14  In re Jacob R. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re JACOB R., a Person Coming Under the Juvenile Court Law. | B253645 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAIME R.,<br><br>    Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK65836) |

APPEAL from orders of the Los Angeles County Superior Court. Rudolph Diaz, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel and Peter Ferrera, Deputy County Counsel, for Respondent.

_____

Jaime R. (Father) challenges the termination of his parental rights and the summary denial of his request under Welfare and Institutions Code[1] section 388. We affirm the challenged orders.

## FACTS

Jacob R. was born to Father and Cynthia M. (Mother) in 2011. A petition was filed under section 300, subdivision (b) on behalf of Jacob on December 29, 2011. It alleged Jacob tested positive for amphetamine at birth because Mother abused the drug while she was pregnant with him. Mother's two older children, Ruby R. and Matthew R., were also born with amphetamine or methamphetamine in their systems. Mother's parental rights over Ruby were terminated on March 27, 2008. Matthew was removed from Mother's custody in 2011, and ultimately adopted.

As to Father, it was alleged that he "knew or reasonably should have known of the mother's substance abuse, and failed to protect the child. The mother's substance abuse, and the father's failure to protect the child, endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of physical harm, damage, danger and failure to protect." It was further alleged that Father "is unable to provide care and supervision of the child. The father's inability to provide ongoing care and supervision of the child, endangers the child's physical health and safety, and places the child at risk of physical harm, damage and danger."

Jacob was placed with a foster family after Mother and Father gave their consent to the Los Angeles Department of Children and Family Services (DCFS) to detain him. Father told the social worker that he had never used drugs and was "clueless" when it came to drugs. As a result, he would not know if Mother was under the influence. He stated he was not able to care for the baby because there was not enough room for the baby in the room he rented with Mother. Mother explained Father has never seen her use methamphetamines, but he knows she uses because sometimes when he comes home, she is high. At those times, he just gives her a "bad look" and other times he does not say

---

[1]     All further section references are to the Welfare and Institutions Code unless otherwise specified.

2

anything. DCFS concluded Jacob should not be released to Father "until he is able to obtain appropriate housing and secure child care arrangements by a family member coming from Mexico."

At the December 29, 2011 detention hearing, the juvenile court found a prima facie case had been made for detaining Jacob because substantial danger existed to his physical or emotional health and there was no reasonable means to protect him without removal. The juvenile court permitted reasonable monitored visits for both parents and ordered the parents to receive substance abuse and individual counseling. Father failed to visit Jacob during this period because he had neither the time nor the money to go. Additionally, DCFS was unable to reach him until February 2012.

On March 29, 2012, Father informed the children's social worker he planned to have Jacob live with Maria Vasquez, someone he knew from Mexico, and he would visit Jacob when he could. Father explained, "The reason for this is because my home is not in a condition to have a baby live here. Also, I will be working all the time and I cannot take care of him." Mother disagreed with Father's intention to allow Vasquez to take care of Jacob.

On April 3, 2012, the children's social worker visited Father and Mother's home. It was a studio attached to a garage that was cluttered with belongings and had no bathroom. Father stated that he had an unassembled bassinet for the baby, but his plan was for Jacob to live with Vasquez. Father planned to visit him every day. When the social worker contacted Vasquez, she stated she could not take care of Jacob because she was in the process of moving. Further, she lived with her husband and two daughters, who had three children of their own.

On April 24, 2012, Father informed the social worker that he really wanted custody of Jacob and was willing to cooperate. Mother affirmed she was willing to move out of the home, though it was unclear whether she had a place to go. As a result, the social worker expressed some concerns about Father's ability to keep Mother out of the home if Jacob was released to his custody. As of May 14, 2012, the social worker noted Mother was still living with Father and did not have any other place to stay. Maria

3

Valencia,[2] Father's proposed day care provider, submitted to live-scan on April 26, 2012. She indicated Father could rent a room in her home and she was willing to look after Jacob while Father was at work.

Jacob's foster mother reported on January 27, 2012, that Jacob was experiencing severe drug withdrawal, demonstrated by excessive crying and fussiness. She also noted that he did not make eye contact and did not smile. At the disposition hearing on May 21, 2012, the juvenile court found by clear and convincing evidence that there existed substantial danger to Jacob and there was no reasonable means to protect him without removal from the parents' custody. The juvenile court also set a permanency plan hearing for November 19, 2012. Family reunification services were ordered along with individual counseling. Mother and Father were granted monitored visits.

On May 1, 2012, Jacob was moved to respite care at a different foster home. His foster mother indicated to DCFS that they were willing to adopt Jacob if he was not reunited with Father. By September 2012, Jacob was bonding well with his foster mother and was on track developmentally.

In the November 19, 2012 status review, Father reported to DCFS that he was willing to comply with the court's order to gain custody of Jacob. He was no longer involved with Mother and was now renting a room with a roommate, who planned to move out after he obtained custody of Jacob. Because he worked one mile from Jacob's placement, Father was able to visit with Jacob five times in October 2012 and once a month from July to September 2012. Father also began participating in parenting classes and counseling and obtained clean drug tests. As a result, DCFS requested unmonitored visits for Father, but the juvenile court refused.

Jacob's second foster family ultimately decided against adoption. His foster mother reported that Jacob was hyperactive, woke twice a night and cried and pulled his hair and ears. Meanwhile, Father completed a 20-class parenting course by March 18, 2013, and 15 sessions with a therapist. Father's therapist characterized his progress in

---

[2]    It is unclear whether this is the same woman as Maria Vasquez, who had earlier stated she was unable to care for Jacob.

developing a trusting relationship, increasing awareness of co-dependency issues, addressing substance abuse issues and improving parenting skills as "fair." Father continued to visit with Jacob on a weekly basis and wanted Jacob returned to his custody. The visits with Father usually went well though there were a few visits when Jacob cried because he did not want to be there.

At the six month review hearing on January 15, 2013, the juvenile court terminated family reunification services for Father. The court concluded it was in Jacob's best interest to select a permanent plan. Jacob was placed with another foster family and was doing well as of February 27, 2013. Jacob's new foster mother indicated that she was willing to adopt him and permit post-adoption contact with Father. The adoptive home was large with an ample backyard. The home study was completed and approved on August 20, 2013. DCFS concluded it was likely Jacob would be adopted if parental rights were terminated. On October 24, 2013, Jacob was hospitalized due to a high fever and a seizure. His pediatrician and neurologist indicated Jacob's condition was hereditary and he would grow out of it by age six. The foster mother indicated Jacob sometimes woke up crying inconsolably as a result of his condition. His condition also delayed a scheduled tonsillectomy.

A permanent plan hearing was set for November 14, 2013. That day, Father filed a section 388 request to change the July 11, 2013 order placing Jacob in foster care. Father requested Jacob either be placed with him or that Father be afforded a chance for a period of reunification. Father stated in his petition he participated in individual counseling and parenting courses, provided consistently clean drug tests, had stable employment and a residence, and visited regularly and appropriately. The juvenile court summarily denied the section 388 request because it failed to state a change of circumstances and the proposed order did not promote the best interest of the child.

At the permanency hearing, Father testified he visited Jacob every Friday and would have liked to visit more. He complained he only had about an hour with Jacob although it took him an hour and a half to get to the location. Father stated Jacob played with him and the toys Father brought to the visits. Father also confirmed two of his

cousins said they would take care of Jacob. However, Father appeared unaware of the extent of Jacob's medical and developmental issues. Indeed, Father only knew that Jacob had been in the hospital twice, but did not know whether Jacob had any special needs.

The juvenile court found by clear and convincing evidence that Jacob was adoptable and that it would be detrimental for Jacob to be returned to the parents. It reasoned, "I don't believe that the relationship that the father has with the child at this time is the appropriate and significant parent/child relationship. [¶] I note that this child who has been in the care of the prospective adopting parent has taken the child on numerous appointments regarding his medical conditions of which Father's had very very little involvement. [¶] I think he is aware and he indicates that he was at the hospital on a recent occasion, but this child needs a lot of attention and care, and I think that the current caretaker has given a significant amount of that and has demonstrated the parental child relationship that I believe is more significant than the father's relationship with the child." Father's and Mother's parental rights were terminated. Father timely appealed.

## DISCUSSION

### I.    Section 388 Petition

Father's primary contention on appeal is that the juvenile court erred when it summarily denied his section 388 petition to have Jacob returned to his custody or to continue reunification services. Father contends he made a prima facie showing to warrant a hearing on the merits. We disagree.

Any parent or other person having an interest in the dependent child, including the child himself, may petition under section 388 to change, modify or set aside an order previously made by the juvenile court. (§ 388, subd. (a).) If the allegations of the petition, liberally construed, do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the juvenile court may summarily deny the petition without a hearing on the petition. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592-594; *In re Jamika W.* (1997) 54 Cal.App.4th 1446, 1450-1451.) Thus, the test for whether a hearing is warranted on a section 388 petition is two pronged: the petitioner must make a prima facie showing that

6

(1) new evidence or changed circumstances exist, and (2) the proposed change would be in the best interests of the children. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) The denial of a hearing on a section 388 petition is reviewed for abuse of discretion. (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

We find the juvenile court did not abuse its discretion in determining Father failed to show changed circumstances or Jacob's best interests. Father's declaration in support of his request stated he "[has] had the longest and most important relationship with" Jacob. Father also asserted, "I have continued in therapy, with random alcohol and drug testing, finished a parenting class. I have regularly visited my son." Father submitted a certificate of participation for 20 parenting classes as well as his regular attendance in alcoholics anonymous meetings from September 30, 2013 to November 10, 2013. Additionally, a progress report from Pomona Open Door counseling showed Father attended 9 out of 20 of his required sessions and was estimated to complete them by January 29, 2014. The therapist commented that Father "has shown much improvement in his classes" and "appears to be benefitting from the Outpatient Program. [Father] participates appropriately during discussions and attends class on a regular basis. Overall attitude at this time is satisfactory." This evidence, according to Father, sufficiently demonstrates a change of circumstances and the child's best interest to trigger a full hearing. Not so.

*In re Hashem H.* (1996) 45 Cal.App.4th 1791, a case relied upon by Father, is instructive regarding the showing required for a full hearing under section 388. There, the child was removed from his mother's custody because her numerous emotional and mental problems prevented her from regularly caring for the child. (*Id.* at p. 1793.) Prior to the contested section 366.26 hearing, the mother filed a section 388 petition. It alleged as changed circumstances: "1. I have regularly and consistently participated in therapy with Dr. Barbara Ammon for over year and half to such a successful degree that Dr. Ammon has recommended in letter attached as Exhibit A and incorporated as reference a return to my custody. 2. I have regularly consistently visited my son since detain [*sic*] and had visits every weekend since 5-4-94 to 12-1-94 when I got every other

7

weekend and since then have had also overnight during the week. [¶] 3. I have participated in conjoint counseling with my son and Dr. Ammon. [¶] 4. I plan to continue in counseling with Dr. Ammon when [my] son is returned for conjoint and continue to have my son continue in his individual counseling. [¶] 5. I have a job and attend many religious functions. [¶] 6. I am ready, able, willing to provide for my son on a full-time basis and to be a mother to him in every sense of the word. [¶] 7. I also plan to continue in my individual counseling since I feel it has helped tremendously in my relationship with my son." (*Id.* at p. 1797.) In further support of her petition, the mother submitted a letter from her therapist recommending the child be returned to her custody. The therapist opined the mother had successfully worked on issues which increased her ability to handle difficulties and there was no reason to believe she could not provide adequate food, shelter, and supervision on a full time basis for the child. (*Ibid.*)

The differences between the showing made in *In re Hashem H.* and Father's petition are obvious. Father's petition demonstrates he made an effort to participate in court-ordered classes and therapy, nothing more. All of the progress reports and participation logs show Father's involvement in the two months before his petition was filed. Although Father's counselor indicated he showed "much improvement" in the classes, Father completed less than half of the required classes by the time of his petition. Importantly, there was no indication Father addressed the issues identified by the juvenile court in its case plan, such as caring for a drug exposed baby. Further, Father failed to show how he can take care of Jacob while he is at work or even where they would live. His statement that he regularly visited Jacob failed to show any progress from monitored visits to unmonitored visits or overnight visits. Unlike *In re Hashem H.*, there was no indication how his participation in classes and regular monitored visits resulted in changed circumstances or the best interest of the child.

At best, Father's petition demonstrates changing circumstances. "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the

child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) "A mere prima facie showing of changing – we hesitate to say, "changed" – circumstances was not enough to require or justify a hearing on return of the child to [him] after two years. [Citation.]" (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.)

Father's reliance on *In re Kimberly F.* (1997) 56 Cal.App.4th 519, is misplaced. *In re Kimberly F.* provided three factors to be considered in evaluating whether a section 388 petition has sufficiently demonstrated the best interests of the child. (*Id.* at p. 531.) It says nothing about the first prong of a prima facie showing under section 388 – changed circumstances. Even if we accept that *In re Kimberly F.* supports a finding that Father made a prima facie showing of the best interest of the child, he has still not fulfilled the requirement to show changed circumstances, as discussed above.

## II. Termination of Parental Rights

Father also challenges the juvenile court's order terminating parental rights, contending "[i]t was error in violation of Constitutional guarantees to due process of law, and rights to liberty, privacy and free association to terminate [Father's] parental rights." We find no error.

Father fails to explain how his rights have been violated beyond vague references to a parent's fundamental interest in the care, companionship, and custody of his children. Indeed, Father was granted six months of reunification services as specified in section 361.5[3] and there is no contention they were inadequate. The juvenile court, at the section 366.21, subdivision (e) review hearing on January 15, 2013, found by a preponderance of

---

[3] Section 361.5, subdivision (a)(1)(B) provides: "For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age, court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care as provided in Section 361.49 unless the child is returned to the home of the parent or guardian." Subdivision (a)(3) of section 361.5 further provides that efforts to provide reunification services may be terminated after six months if the parent fails to participate regularly in any court-ordered treatment programs or to cooperate or avail himself of services provided as part of the child welfare services case plan.

9

the evidence that returning Jacob to Father's custody would create a substantial risk of detriment and terminated family reunification services for Father. It concluded it was in Jacob's best interest to set a hearing to select a permanent plan of adoption, guardianship, or other planned permanent living arrangement. The juvenile court also found by clear and convincing evidence that it was likely Jacob will be adopted. Under section 366.26, subdivision (c)(1), the juvenile court must terminate parental rights if it finds the child will likely be adopted, unless it would be detrimental to the child based on one of several statutory exceptions. (§ 366.26, subd. (c)(1)(B).) Father does not contend any of the statutory exceptions apply or that the juvenile court failed to follow the law in making its findings and orders.

Instead, Father contends DCFS searched for reasons to justify keeping Jacob from him. Father asserts, "Once [Father] separated from the mother, severing his relationship with her [], Jacob should have been placed with [father] as any threat to Jacob's well-being as defined by the allegations sustained under section 300 which conferred jurisdiction on the juvenile court had been cured by the mother's absence from the family home. Rather, Jacob was held in foster care beyond the need to protect him from the risks defined by section 300, so that he could be adopted by the foster mother with a spacious family home with a backyard and a job that afforded her family leave." The allegations sustained in the section 300 petition refute Father's argument.

The allegations against Father were two-fold: (1) he failed to protect Jacob from Mother's substance abuse and (2) he was "unable to provide care and supervision of the child. The father's inability to provide ongoing care and supervision of the child, endangers the child's physical health and safety, and places the child at risk of physical harm, damage and danger." Thus, it was not the case that only Mother stood between Jacob and his return to Father's custody. Father failed to show any progress in providing care and supervision of Jacob.

A parent's rights to the care and companionship of her child are, of course, compelling. But the child's rights to a stable and loving family are equally compelling. The balance between the parent's and the child's rights shifts after the child has been

10

removed from the parent's home for a substantial time, owing to abuse or neglect by the parent, and the parent has failed to correct the problems which led to the removal. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) Accordingly, under California law, after reunification services are terminated in a dependency proceeding, the focus of the court's concern shifts from assisting the parent in reunification with the child to securing a stable new home for the child. (*Ibid.*)

By the time of the section 366.26 hearing, Jacob was nearly three years old and had never lived with either of his parents. Indeed, he had never had unmonitored or overnight visits with Father. There is no indication in the record that any of Father's proposed caretakers were willing or able to care for Jacob while he worked. There is also no indication that Father was able to provide the level of care necessary to raise a child with Jacob's issues. Indeed, Father himself admitted he was unaware of Jacob's many health issues and developmental delays. Given these circumstances, termination of parental rights was not error.

## DISPOSITION

The challenged orders terminating Father's parental rights and summarily denying his section 388 petition are affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.